v. Winn-Dixie Montgomery. May it please the court. Good morning. Good morning. My name is Tom Talte and I represent the appellant plaintiff Varonica Udeh. Ms. Udeh, as I think the court is aware, tried to return from maternity leave early and she was told that she could, but her doctor, when she consulted her doctor, her doctor told her she could not. That's Ms. Udeh's version. And she was terminated for not showing up for work when she was scheduled. There are a number of problems in this case. One of the problems is the great weight of the evidence surely is in Ms. Udeh's favor because the principal witness for Winn-Dixie, Ms. Monica Sledge, who was the store manager, consistently told different stories about the facts in the case. And her initially she gave a sworn statement, and I believe it was March of 2010, Ms. Udeh was terminated July 23rd or 4th of 2009. And in that statement, Ms. Sledge said that she did not return for work and that she didn't remember various calls from Ms. Udeh that were made. Subsequently, there was a deposition in February of 2012, and that story changed again. She still didn't remember much. Then at trial, she remembered in great clarity that the calls Ms. Udeh claimed she made telling Sledge that her doctor would not let her return to work and so she couldn't come back early like she wanted because her husband had lost his job and so forth and so on. As the court recalled, there was a great recession going on at that time.  I believe they were at great length. I think what happened at trial, Your Honor, if I can, I'm going to segue into the more important things. I think there was an error of law made in the issuance of the verdict form and in a jury instruction. And that jury instruction said the first thing to ask the jury was, did Winn-Dixie discharge Ms. Udeh and that discharge constitute an adverse employment action? And the problem with that is Ms. Udeh was terminated, and it's very clear in the Eleventh Circuit that a termination is an adverse action. And so when you put a statement out of this nature and it's in the verdict form and the jury was charged with that, the jury now begins to wonder, okay, we know she was fired, but what's this other thing that the discharge constitutes an adverse action? Did you request a charge defining what an adverse action is? Yes. In fact, I think both parties had that in a proposed charge. And we had a charge conference where we argued these things quite a bit, particularly the verdict form, because I, as Ms. Udeh's counsel, I was opposed to that statement about adverse action. I wanted to use the Eleventh Circuit pattern jury instructions, which basically said, did you find she was discharged? Because that prong of the determination is strictly, you know, were you harmed? The next prong is— Is the charge conference in the record? I did not find it in the record, and I looked. But we talked about it a great deal, and the judge decided, no, I'm going to issue this charge, and that charge I understood she was going to issue. It was also going to have the definition of adverse action, but it was not in the record. But my understanding is that much of the trial would have been discussing this disagreement about the circumstances of Ms. Udeh's non-return with the company's position being, look, you know, she wanted to come back, but then we gave her some hours. Maybe she didn't like it. She said, just forget it. I'm not coming back. And then she doesn't come back the day she's supposed to. Her position is different from that, that she didn't do that. That's correct. So isn't it reasonable to think that the jury understood with this question what the question they're really answering was, you know, did they just fire her for no reason because she didn't come back, or, in fact, did she announce, I'm not coming back? And couldn't one infer from this the jury accepted Sledge's version of things, which is she said to Sledge, I'm just not coming back. Isn't that reasonable? I don't think so, Your Honor. And the reason why is if you look at the second prong in the verdict form, that Ms. Udeh's pregnancy was a motivating factor that prompted Winn-Dixie to take action. That's the real question right there. You were discharged. Okay. Was it good or bad reason? So the jury doesn't get to that. They don't get to the proper question. Because they thought she just said, I'm not showing up. Well, Ms. Sledge, who made a number of statements and various points in sworn statements, says, yeah, no, I told her to come back. In fact, you will read in my brief there's a number of things where she says, I didn't give her the date and time. I didn't give her the time. She was on the phone calling me. Then she went home. It is a confused mess. Ms. Udeh says very clearly and testifies very clearly, you know, we had a conversation. I told her I hadn't checked with my doctor yet. She said, well, check with your doctor. I called my doctor right away. I called her back and said my doctor will not let me return to work before my postpartum checkup clears me so I can't come to work. Ms. Sledge says, no, I don't remember any of that. That didn't happen. She says I didn't remember it in her first sworn statement. The later trial she says that never happened. Ms. Prisby, her co-manager at trial, says that didn't happen. No. I said, well, what about your statement? Ms. Prisby also had a sworn statement in 2010. What about that sworn statement where you say you don't remember? There's a difference between you don't remember and three and a half years later saying it never happened, which is what was going on with these two. So I think if the jury sees that, they might be buying into an argument, but it's not the argument that counts. The one that counts is, was pregnancy a motivating factor? Had Ms. Uday not taken because there's a lot of confusion. I know this is not your main issue, but what was the evidence you indicated that pregnancy was a motivating factor? They apparently readily gave her pregnancy leave, weren't unhappy with that, they were ready to let her come back. So what was your evidence that even if they did discharge her, and some of her story is right, that pregnancy had anything to do with it? Well, of course, I believe Ms. Uday is telling the truth, for one thing. And so she says, and I'm saying, her pregnancy had to be a factor because it gave the opportunity for them to discharge this employee. And, in fact, she said— They had the opportunity because they wanted to get rid of her anyway? She had been replaced in her position by Lisa Hubbard. And also at that time, Ms. Sludge was a fairly new store manager, and so arguments were she wanted to reduce expenses. She denied this, of course. But the fact is, had pregnancy not been there, and Ms. Uday not had a financial need to try to come back early— And, by the way, her doctor's statement says she can't come back until sometime in August, until she has a postpartum. And that is a July 11th Winn-Dixie Certificate of Healthcare form that was filled out by the doctor. So it's true that she can't come back. It's true that she has terrible financial problems. Now, whether or not Ms. Sludge made a mistake or not, that pregnancy made her available to be terminated if you want to— It wasn't necessarily the motivating factor. They didn't say, oh, we just hate women that get pregnant and lay out of work. It was, we don't want to bring Ms. Ubo back. I don't think it has to be that strong, we hate pregnant women. Although there was some evidence we were not allowed to talk about at trial that would have perhaps touched on that. It was a response to an interrogatory. But if pregnancy is a tool or in some way or another influences a decision, my understanding is that's enough. That this is sort of a woe-be-unto form of Title VII, which is if you mess with a pregnant woman, you better be sure that pregnancy didn't have anything to do with her termination. And here it does. The poor woman is trying to come back early and her doctor tells her no. They say, no, that's not the case. She said she was coming back. And then there's three or four versions about whether or not she's told when to come back, whether she's told what time to come back, whether she's in the office talking to her, or whether she's on the phone talking to her. I think that what happened was there was so much discussion that we tried to keep out through a motion eliminating not to allow Winn-Dixie to go back in time to whether or not she had the proper forms filled out and so forth and so on. But she is granted returning to leave and it's admitted by Winn-Dixie, but there is logs of testimony about this. Then there are other issues in the case that creep in. There is a witness for Ms. Uday that called me and said she had signed a declaration for an attorney for Winn-Dixie and she wanted to let me know and she thought maybe because of the declaration she had heard she might not need to come to trial. I said, do you mind if I see that? I went to her house. I don't know if it was that day or the next day. Got a copy of it. She wasn't there. I then met with her at her place of work and I had a tape recorder in my pocket. I tape recorded the conversation, which to me indicates that her chance for that, her testimony was influenced. She now could not remember things earlier she told me she could and so forth and so on. If the court is interested, I'd be glad to leave the court. She testified at trial, right, Ms. Weston? She did testify at trial. It shows not to go into any of that in your questioning. We would have had to go into the whole thing and at that point she was compromised so badly I didn't see where it was going to be of much benefit. They were going to have a declaration. She was going to say something else. The other thing I wanted to mention is the issue about, if I might mention for a second here, about Ms. Fletch being the corporate representative and personally disagreeing with her testimony as the corporate representative. There are things missing from the transcript on that and I have my emails to the court reporter talking to her about, there are places later on in the transcript that talk about this. Would you check your audio recordings? And she got back and said, yeah, I checked my audio recordings. She said, there's no problem. And I said, would you mind if I got a copy of them or came and listened to them? She said, no, I can't get you a copy. And then I said, well, actually that's the third email. I said, well, can I come to your office and you can control them while I listen to them? And I never received an answer. Do you think that, I mean is your argument that what was omitted was where you objected? Yes, Your Honor. Exactly. So that is sort of the issue. I believe the verdict form was incorrect. It is actually a misstatement of the law because if you look at the pattern jury instructions, they say, for example, you're at discharge. And you're saying you objected to that instruction. Yes. And to that verdict form. Yes, and I have the proposed jury instructions and I believe they're on record. I guess, may I reserve the rest of my time? Yes. Thank you. Thank you. Before you sit down, you say that the instructions that you gave to the district court included the definition that you wanted of adverse action? Yes. But, you know, they talk about adverse, it talks about adverse material significant change in your terms, conditions of employment. But the verdict, the proposed verdict form that we submitted said was, did you find that Ms. Uday was discharged by Winn-Dixie? And that was turned down in favor of, and also, there was an adverse action. And the jury did not receive the definition of what's an adverse action in the charge. And it's redundant to say, was she discharged and did she suffer an adverse action? So, the jury is left pondering, well, what to do with this other thing? They're also advised, in closing, by defense counsel, to my right, that all they need to do is answer no to number one and they're out of there. And it's a Friday afternoon. Does that answer your question, Your Honor? Yes. I think your written request is in the record on appeal, isn't it? I mean, we can see it. I have it, Your Honor. I think it is. But we actually, it is a proposed, a joint proposed jury instruction. It is in the record. I don't think it's in the documents I included. And it includes this definition of adverse action that you requested. Yes. And at my right, I'm pretty sure I'm right. The definition of adverse action is included in both what we propose for Ms. Uday and what defense counsel proposes for Winn-Dixie. Do you have that? You said you have it with you? Yes, Your Honor. Can you, when you, I don't know if you can, but if you, when you get back up, if you can give me the page number where that reference is? Yes, ma'am. Okay. Thank you very much. Yes, ma'am. Good morning. Good morning, Your Honor. May it please the Court, my name is John Smith Tee. I'm here for the appellee, Winn-Dixie of Montgomery. I think I should just jump first to the jury issue that the Court has raised and that Mr. Talte was discussing. I would take issue with his description of what happened. The record does contain the charge conference in Volume 4, Document 126, page 587. That is where the definition of adverse employment action was discussed. If I can step back just a minute and explain, and the proposed jury instructions from both parties are also in the record. I did not have a chance to look through the transcripts to find it, but it is in there. I remember looking at it. Winn-Dixie asked for the definition of adverse action, and we included that in our proposed charge. The plaintiff did not, is my memory. If you would look at Volume 4, Document 126, page 587, again, that's the transcript of where the Court has the charge conference and is asking the parties, the lawyers, about the charges, and that issue is taken up. The Court firmly rejects the proposal by Winn-Dixie to define adverse action. And her explanation for that is in the record, and you can read that for yourselves. The plaintiff... What was her explanation in short? I mean, don't read it. Well, basically she said it's not necessary to define those words which have plain meaning, and that there's been a lot of argument by the parties about whether or not Ms. Uday was sustained to adverse action, meaning whether or not she was terminated or whether she voluntarily chose not to come back to work. And the trial judge said the parties, the lawyers, could handle that during closing argument. That was her determination. But again, I would reiterate, for purposes of appeal, the only issue that plaintiff has raised, that appellate has raised, is that adverse action was not defined. He does not, in his appeal, in his brief on page, I believe it's 51, he doesn't argue about the verdict form as a whole or even the initial charge. All he argues about, all appellant argues about is the absence of a definition of adverse action. And again, I submit, Your Honors, that the plaintiff never offered such a definition. That didn't happen at the charge conference. Now, one other point on that. That was at the end of the evening on the next to last day of trial. We had the charge conference. We all went home for the night. The next morning, and I think even later that night, the trial judge emailed us her final jury charges, which we then had an opportunity to look at, review, and then she had us in the morning of, the next morning, to review those final charges. And there's a very brief discussion of that in volume one of the appendix. And if you look at volume one, document 122, page two, the trial judge asked the parties if there are any other revisions or problems with the jury charges that she has circulated. And both parties said no. There were no objections raised, including as to adverse action. So, Your Honor, first of all, we would submit plainly this issue has been waived. It has not been properly preserved by the appellant. And secondly, we would just submit that even if that were not the case, we're not aware of any authority that would require a definition of adverse action. I think the trial judge had it right. Even though I did not get my way and get a definition, I think the trial judge was correct in that there's a fairly plain meaning as to what that means, and it doesn't need to be elaborated upon. That was her rationale, and I think she had a point. So, we would submit those points in response to the issue raised by appellant this morning. Thank you. Secondly, Judge, just more broadly, I think what you have heard is a very good example of a party that loses at the trial level and now asks the reviewing court improperly, I submit, to come back and re-weigh the evidence, make new evaluations of the testimony, make new credibility determinations. We heard a lot of examples from the record that appellant's counsel pointed out where he disagreed with some of the testimony, and he said it should have been interpreted one way or the other. Very frankly, that's what the jury is supposed to do, as one of the members of the panel pointed out. All of this was supplied to the jury in abundance. The jury of eight men and women sat through three and a half days of testimony. They heard from eight witnesses. They received 25 different exhibits. They received very thorough jury instructions on how to weigh evidence, what to do about inconsistencies, memory lapses. It's worth pointing out that this matter, the events in question happened in 2009, and that the jury trial did not occur until 2015. That's almost six years, and we made that point in our closing argument that it's not surprising that there are going to be inconsistencies and differences of memory over time. That happens. Again, the jury was instructed on that, processed all of that, and took about an hour before returning its verdict in favor of Winn-Dixie. We submit, Your Honors, that there is an abundance of evidence in the record to sustain that jury verdict, and it would be highly improper to substitute a different judgment for that outcome. The standards for doing that are well known to this court. They don't need to be repeated by me, but that is essentially what the appellant is now asking, is to re-weigh all of the evidence and say that there is no reasonable way a jury could have come up and reached the verdict that it did. We submit that a review of the very substantial record in this case clearly supports the outcome that was reached. Your Honor, if there are no more questions, I will yield back the balance of my time. Let me ask you one question. Yes, ma'am. I know you said the only issue here that's preserved is the instruction issue, that there's nothing here about verdict forms, but keeping that in mind, did opposing counsel object to the verdict form below? No, ma'am. I thought he indicated he had, but you've read the record and you see nothing indicates. He said, Judge, that's a confusing question on the form. Let's redo it. Nothing like that. Let me answer it this way, Your Honor. There were competing jury instructions offered. There was not, I don't believe there were competing jury verdict forms offered. The judge developed the jury verdict form on her own and presented the verdict form to the parties. There was no objection to the verdict form itself. All right. Thank you. Your Honor, we would just ask that the court affirm the trial verdict in Winn-Dixie's favor. Thank you. Thank you. Your Honor, my approach has led you. You can just tell me the number and the record. Thank you. Yes, ma'am. Your Honor, this is document 89. It's listed as proposed jury instruction by Winn-Dixie, but it's actually jointly proposed jury instructions. And within document 89, you'll see that Winn-Dixie's alternative and then you'll see the plaintiff's alternative. My understanding was yours did not include the instruction on the definition of adverse action. I believe that's incorrect, Your Honor. If you give me one moment, I'll take a look. Maybe it did. I mean, if it's true, I guess Judge Heikkila sent you her final jury instruction. I think she did, Your Honor, but at that point, we had belabored this and the judge disagreed with us and we disagreed.  Well, next time you might want to do that. I think I will, Your Honor. Your Honor, I was looking for that. I'm looking through it. I know which exhibit, the docket entry 89. Yes, ma'am. So I can look at that. I appreciate you not wanting to use my time, but that was... Also, there is a proposed verdict form at the end of the proposed jury instructions. There's a proposed verdict form and ours simply says, as the pattern jury instructions recommend and used for an example of an adverse action, termination. Because once again, the adverse action is termination. So when you asked both, did you find Ms. Uday was discharged? If you're saying you did propose, your client did propose her own verdict form. Yes, both sides did. Was it a joint proposal? No, each side did and we differed on a couple of critical ones and that is it. And this is it. That's all in document 89? Yes, Your Honor. Also, I think that my understanding... When all is said and done, there's a lot of balls in the air when you're getting ready to present the case. When the decision was finalized by the district court, you did not object to the verdict form. Is that correct? My understanding was that I had lost and I did not want to anger the judge any more than I already had. And so I did not object again. I felt like the objection was there. My understanding is that this court, whether there's an objection or not, can say that if manifest injustice will result. It's a different standard of review and it's a lot tougher. I understand. I'm just saying those options exist out there. I know you all know, but I wanted to mention that. Also, the defense counsel was talking about Ms. Sludge, if I may have a moment more. Her memory was improving with the years, not getting better. I mean, it was getting better in her mind. Something we all aspire to. Well, she said she thought about it real hard. And so she didn't think about it very hard when she signed the sworn statement and she didn't think about it very hard when she was deposed, but she had thought of it really hard since and she wanted to do what was right. All right. Well, thank you very much. We appreciate you all making the trip. That concludes our court for today, and we'll reconvene tomorrow morning at 9 o'clock.